United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PEDRO GOMEZ,                    )    No. C 08-2969 MMC (PR)
                               )
            Plaintiff,          )    **ORDER GRANTING SUMMARY**
                               )    **JUDGMENT ON DELIBERATE**
      v.                        )    **INDIFFERENCE CLAIMS; DISMISSING**
                               )    **SUPPLEMENTAL STATE LAW**
MERLE SOGGE, et al.,            )    **MEDICAL CLAIMS; GRANTING IN**
                               )    **PART SUMMARY JUDGMENT ON**
            Defendants.         )    **EXCESSIVE FORCE CLAIMS;**
_____ )    **REFERRING FOR SETTLEMENT**
                                    **PROCEEDINGS**

                               **(Docket Nos. 60, 81, 112, 116, 121)**

      On June 16, 2008, plaintiff, a California prisoner incarcerated at Pelican Bay State

Prison ("PBSP") and proceeding pro se, filed the above-titled civil rights action under 42

U.S.C. § 1983, claiming deliberate indifference to his serious medical needs and unlawful

use of excessive force.  Thereafter, the Court referred the matter to Magistrate Judge Nandor

Vadas for early settlement proceedings under the Northern District's Pro Se Prisoner

Mediation Program.  The parties, however, were unable to reach a settlement agreement, and

the Court directed defendants to file their dispositive motions.

      Now before the Court are the motions for summary judgment filed on behalf of five

separate groups of defendants.  Plaintiff has opposed the motions and defendants have filed

1   replies.

2                                   **DISCUSSION**

3   I.      Legal Standard

4           Summary judgment is proper where the pleadings, discovery, and affidavits show

5   there is "no genuine issue as to any material fact and that the moving party is entitled to

6   judgment as a matter of law."  See Fed. R. Civ. P. 56(c).  Material facts are those that may

7   affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8   (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable

9   jury could return a verdict for the nonmoving party.  See id.

10          The court will grant summary judgment "against a party who fails to make a showing

11  sufficient to establish the existence of an element essential to that party's case, and on which

12  that party will bear the burden of proof at trial[,] . . . since a complete failure of proof

13  concerning an essential element of the nonmoving party's case necessarily renders all other

14  facts immaterial."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also

15  Anderson v. Liberty Lobby, 477 U.S. at 248 (holding fact is material if it might affect

16  outcome of suit under governing law; further holding dispute about material fact is genuine

17  "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

18  party").  The moving party bears the initial burden of identifying those portions of the record

19  that demonstrate the absence of a genuine issue of material fact.  The burden then shifts to

20  the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the

21  'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts

22  showing that there is a genuine issue for trial.'"  See Celotex, 477 U.S. at 324 (citing Fed. R.

23  Civ. P. 56(e)).

24          For purposes of summary judgment, the court must view the evidence in the light most

25  favorable to the nonmoving party; if the evidence produced by the moving party conflicts

26  with evidence produced by the nonmoving party, the court must assume the truth of the

27  evidence submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158

28  (9th Cir. 1999).  The court's function on a summary judgment motion is not to make

United States District Court

For the Northern District of California

                                              2

credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

II.    Deliberate Indifference to Serious Medical Needs

In the first amended complaint ("FAC"), the operative pleading herein, plaintiff claims he received constitutionally inadequate medical care from May 17 through May 24, 2007, the period during which he underwent a liver biopsy at PBSP and thereafter suffered from complications related thereto.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." Id. (citing Estelle v. Gamble, 429 U.S. at 104).  A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." Id.  Consequently, in order for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. See McGuckin, 974 F.2d at 1060.

A claim of medical malpractice or negligence is insufficient to make out a violation of the Eighth Amendment.  Id. at 1059.  Nor does a difference of opinion between a prisoner-patient and prison medical authorities regarding proper treatment amount to deliberate indifference.  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  In particular, a

plaintiff's opinion that medical treatment was unduly delayed does not, without more, state a claim of deliberate indifference.  Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  Rather, in order to prevail on a claim based on delayed treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, such treatment was chosen in conscious disregard of an excessive risk to the plaintiff's health, and the delay resulted in harm to the plaintiff.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

The Court next considers the evidence presented by each group of defendants in support of their respective motions for summary judgment concerning plaintiff's claims of deliberate indifference to plaintiff's serious medical needs, and plaintiff's evidence in opposition thereto.[1]

    A.    Plaintiff's Claims

        1. Dr. Sogge

            a. Facts

Plaintiff claims defendant Merle Sogge, M.D. ("Dr. Sogge") acted with deliberate indifference to plaintiff's serious medical needs in connection with a liver biopsy procedure he performed on plaintiff.  The evidence submitted by the parties in support of and opposition to the motion for summary judgment shows the following:

In May 2007,[2] plaintiff, who was incarcerated at PBSP and had been diagnosed with Hepatitis C, was scheduled to undergo a liver biopsy as a prerequisite to his being treated with Interferon.  Dr. Sogge, a medical doctor employed at PBSP, performed a percutaneous liver biopsy on May 17.  (Decl. David M. Freeto, M.D., ("Freeto Decl.") in Supp. Mot. Summ. J. ¶ 8 & Decl. Michael Ubaldi in Supp. Mot. Summ. J. Ex. C (PBSP Medical Records) ("Ex. C") AGO-PBSP-MED 050.)  Prior to Dr. Sogge's performing the liver

---

[1]The facts in the following section are drawn from plaintiff's verified complaint, including attached exhibits, and the parties' evidence submitted in support of and in opposition to the motion for summary judgment.  The facts are undisputed unless otherwise noted.

[2]All further dates referenced herein are in 2007, unless otherwise noted.

4

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

biopsy, plaintiff was informed of the risks associated with the procedure and the possible complications involved.  Plaintiff signed a "Consent for Surgical Operation," authorizing Dr. Sogge to perform the liver biopsy.  (Ex. C AGO-PBSP-MED 067.)  Additionally, Dr. Sogge, prior to performing the biopsy, performed a pre-operative evaluation.  Specifically, Dr. Sogge reviewed plaintiff's lab reports to confirm that the coagulation studies were normal, confirmed in a meeting with plaintiff before the procedure that plaintiff had taken nothing by mouth after midnight the night before, and went over the biopsy procedure with plaintiff. (Freeto Decl. ¶ 9.)

Dr. Sogge performed the liver biopsy using a #16 gauge needle to extract a specimen of the liver.  (Id. ¶ 10 & Ex. C AGO-PBSP-MED 050.)  As set forth in the declaration of David M. Freeto, M.D., a specialist in gastroenterology who is familiar with the standard of care for treatment of patients with Hepatitis C and has reviewed plaintiff's medical records herein, use of this size needle is standard for the procedure. (Freeto Decl. ¶ 10.)  Dr. Sogge also performed the biopsy with percussion of the liver, which procedure likewise was within the standard of care required of doctors performing such a biopsy.  (Id.)

At the start of the biopsy procedure, Dr. Sogge told plaintiff to take a few deep breaths and then exhale.  (FAC ¶ 32.)  Dr. Sogge then told plaintiff to take another deep breath, and when plaintiff started to inhale he felt an immediate sharp pain inside of his body, towards the center of his chest.  (Id.)  Plaintiff felt he couldn't breathe normally.  (Id.)  Dr. Sogge told plaintiff that what plaintiff was experiencing was within normal expectations for the procedure, and instructed plaintiff that if after his release from the Correctional Treatment Clinic he continued to experience shortness of breath, chest and abdominal pain, or persistent bleeding from the puncture site to immediately let officers and medical staff know.  (FAC ¶ 33.)  The sole occasion on which Dr. Sogge saw plaintiff was the performance of the biopsy procedure.  (Freeto Decl. ¶ 11.)

After the biopsy procedure, plaintiff was taken to another room to be monitored. (FAC ¶ 33.)  He remained there for approximately two hours before being returned to his cell, at which point he was provided with discharge instructions that included signs and

United States District Court

For the Northern District of California

1    symptoms to watch for.  (Freeto Decl. ¶ 11 & Ex. C AGO-PBSP-MED 007, 033, 066.)

2          For a period of days following the liver biopsy, plaintiff complained of shortness of

3    breath, abdominal pain, and nausea.  Between May 18 and 23, he was seen a number of times

4    by PBSP medical staff and evaluated for these symptoms.  (Id. ¶ 12.)  Dr. Sogge was never

5    informed of any of the complaints made by plaintiff post-biopsy.  (Id.)  On May 23, plaintiff

6    was evaluated by a physician at the prison infirmary and transferred to Sutter Coast Hospital

7    ("SCH") for abdominal imaging.  (Id. ¶ 13.)  At SCH, plaintiff was discovered to have an

8    upper GI bleed; specifically, an upper GI endoscopy revealed hematobilia (blood coming

9    from the biliary tract).  (Id.)  Plaintiff was transferred to the University of California Medical

10   Center at San Francisco ("UCSF"), where he was found to have a severed hepatic artery and

11   an arterial portal fistula.  (Id.; FAC ¶ 128.)

12         According to Dr. Freeto, bleeding is an acknowledged risk for liver biopsy because,

13   no matter how the biopsy is performed, it is impossible to direct the needle away from every

14   small blood vessel in a highly vascular organ such as the liver; consequently, bleeding is not

15   indicative of poor technique.  (Freeto Decl. ¶ 14.)  In Dr. Freeto's opinion, Dr. Sogge's

16   performance of the liver biopsy, as well as his discharge instructions and post-operative care

17   and treatment, were in conformity with the requisite standard of care.  (Id.)

18                          b.  Analysis

19         Plaintiff claims Dr. Sogge acted with deliberate indifference to plaintiff's serious

20   medical needs by incorrectly advising plaintiff that the pain plaintiff felt during the procedure

21   was normal, and failing to recognize that he had lacerated an artery in plaintiff's liver.

22   Plaintiff has failed to present, however, any medical evidence to counter Dr. Sogge's

23   evidence that Dr. Sogge's advice to plaintiff was reasonable and that the treatment Dr. Sogge

24   provided was within the requisite standard of care.  Specifically, the only evidence presented

25   by plaintiff in opposition to Dr. Sogge's motion for summary judgment is plaintiff's

26   declaration attesting to the same facts asserted in the FAC, i.e., that plaintiff felt pain during

27   the procedure and Dr. Sogge told him such pain was normal.  Plaintiff's conclusory

28   assertions are insufficient to raise a triable issue with respect to plaintiff's claim that Dr.

United States District Court

For the Northern District of California

1    Sogge, by performing the procedure as he did and telling plaintiff the pain he experienced

2    during the procedure was within the parameters of what should be expected, knowingly

3    disregarded a substantial risk of serious harm to plaintiff.  Further, the evidence is undisputed

4    that Dr. Sogge was never made aware of plaintiff's post-operative medical complaints;

5    consequently, Dr. Sogge could not have acted with deliberate indifference to plaintiff's

6    serious medical needs by failing to respond to such concerns.

7         Based on the above, the Court concludes there is no evidence from which a reasonable

8    trier of fact could conclude Dr. Sogge acted with deliberate indifference to plaintiff's serious

9    medical needs.  Accordingly, summary judgment will be granted in favor of Dr. Sogge on

10   plaintiff's Eighth Amendment claim.

11              2.   Nurse Waddell

12                   a.   Facts

13        Plaintiff claims defendant Susan Waddell, R.N. ("Nurse Waddell") acted with

14   deliberate indifference to plaintiff's serious medical needs in connection with the liver biopsy

15   procedure.  The evidence submitted by the parties in support of and opposition to the motion

16   for summary judgment shows the following:

17        Nurse Waddell was assigned to the liver-biopsy clinic at PBSP at the time of

18   plaintiff's liver biopsy.  (Decl. S. Waddell in Supp. PBSP Defs. Mot. Summ. J. ("Waddell

19   Decl.") ¶ 3.)  Before the biopsy, Nurse Waddell explained to plaintiff the risks associated

20   with the biopsy procedure. (Id. ¶ 4.)  Plaintiff, by signing the form consenting to the

21   procedure, indicated that he understood the risks.  (Id. & Decl. Trace Maiorino in Supp.

22   PBSP Defs. Mot. Summ. J. Ex. A (PBSP Medical Records) ("Ex. A") at AGO 067.)   Nurse

23   Waddell was not present for the liver biopsy and did not observe it.  (Waddell Decl. ¶ 4.)

24        Following the procedure, Nurse Waddell monitored plaintiff in the clinic for

25   approximately two hours before he was returned to his cell.  (Id. ¶ 5.)  During that time, she

26   recorded plaintiff's vital signs on six separate occasions and noted plaintiff showed no signs

27   or symptoms of complications related to the biopsy procedure.  (Id.)  Also during that time

28   period, Nurse Waddell took plaintiff's temperature every fifteen minutes.  (FAC ¶ 34.)

During "several of" the temperature checks, plaintiff told her he couldn't breathe normally because he would get a pinching pain on the lower right side of his stomach and pain in his chest.  (Id.)  Nurse Waddell told plaintiff his symptoms were normal and that the pain would go away.  (Id.)  After two hours plaintiff was able to breathe a little better, although he was still in some pain, which Nurse Waddell again advised him was normal and would go away.  (Id.)

Nurse Waddell determined plaintiff could be returned to his cell.  (Waddell Decl. ¶ 5.)  Before plaintiff was transferred, Nurse Waddell verbally provided him with post-operative instructions, telling him to contact clinic staff with any complaints listed on the post-operative instructions, as well as any other problems he might experience in the next few days.  (Id.)  Additionally, she told plaintiff to tell custody staff that he had undergone a liver biopsy and was instructed to request medical treatment if he had any problems.  (Id.)  Plaintiff confirmed that he understood the post-operative instructions and signed the form titled "Post-op Instructions for Percutaneous Liver Biopsy."  (Id. & Ex. A at AGO 066.)  The form advised plaintiff to report to medical staff if he experienced shortness of breath, persistent bleeding from the puncture site, abdominal distress, fainting spells, or fever.  (Id.)  Nurse Waddell further advised plaintiff that some amount of soreness at the puncture site is common following a liver biopsy, but pain is not normal and that he needed to report any such pain he felt.  (Waddell Decl. ¶ 5.)  After May 17, Nurse Waddell had no further direct contact with plaintiff and no opportunity to provide him with medical treatment.  (Id. ¶ 6.)

On May 22, plaintiff was seen at his cell by a nurse, for complaints of severe stomach and chest pains and trouble breathing.  When plaintiff asked to see a doctor, the nurse told plaintiff that he had been placed on the doctor's list for the following day, and that Nurse Waddell also had been notified of plaintiff's complaints.  (FAC ¶¶ 67-70.)  The nurse contacted Nurse Waddell and told her that plaintiff had complained of "severe chest pain" and difficulty breathing, but that he did not appear to be in physical distress.  (Waddell Decl. ¶ 7.)  Nurse Waddell was further advised that plaintiff's breathing, heart rate, and temperature were normal and that he was able to walk without any guarding of his chest area.

8

United States District Court

For the Northern District of California

1   (Id.)  Nurse Waddell informed the nurse that "chest pain" was not listed on the post-operative

2   instructions as an indicator of complications from a liver biopsy.  (Id.)  Nurse Waddell does

3   not supervise the nurse who contacted her, and the nurse does not report to Nurse Waddell as

4   part of her job duties.  (Id.)  Nurse Waddell had no further contact with the nurse on May 22,

5   and at no time on that date was Nurse Waddell responsible for providing medical treatment to

6   plaintiff.  (Id.)

             b.  Analysis

8         Plaintiff claims Nurse Waddell acted with deliberate indifference to his serious

9   medical needs because she did not adequately explain to plaintiff the risks associated with the

10  biopsy procedure, she did not adequately monitor plaintiff after the procedure because she

11  failed to realize plaintiff had suffered a medical complication during the procedure, and she

12  failed to respond when she was alerted several days after the procedure that plaintiff was

13  experiencing pain.  The Court finds plaintiff has failed to raise a triable issue of fact with

14  respect to deliberate indifference on the part of Nurse Waddell.

15        Specifically, even if, as plaintiff asserts, Nurse Waddell did not adequately explain to

16  him the risks of the procedure before he signed the consent form, such failure would

17  constitute no more than negligence and does not rise to the level of deliberate indifference.

18  Further, the undisputed evidence shows Nurse Waddell regularly monitored plaintiff during

19  the two hours he remained in the clinic after the procedure, and that she noted no symptoms

20  of complications.  Moreover, plaintiff has presented no evidence to dispute the declaration

21  submitted by M. Sayre, M.D. ("Dr. Sayre"), the Chief Medical Officer for PBSP, who attests

22  that plaintiff's injury was not immediately detectible by medical staff following the liver

23  biopsy, and that it took at least two days for his symptoms to progress to the point where

24  emergent medical care was necessary.  (See Decl. Dr. Sayre in Supp. PBSP Defs. Mot.

25  Summ. J. ("Sayre Decl.") ¶ 10.)  Lastly, although plaintiff argues that Nurse Waddell's

26  position as the liver-biopsy nurse at PBSP required her to respond to him when, five days

27  after plaintiff's procedure, she learned from another nurse that plaintiff was experiencing

28  pain, the undisputed facts show Nurse Waddell spoke with the nurse and advised her that

United States District Court

For the Northern District of California

chest pain was not an indicator of complications from a liver biopsy; further, as set forth above, the undisputed evidence is that Nurse Waddell was not responsible for providing medical treatment to plaintiff on that date. (See Waddell Decl. ¶ 7.)

Based on the above, the Court concludes there is no evidence from which a reasonable trier of fact could determine Nurse Waddell acted with deliberate indifference to plaintiff's serious medical needs.  Accordingly, summary judgment will be granted in favor of Nurse Waddell on plaintiff's Eighth Amendment claim.

### 3. Officer Cox

#### a. Facts

Plaintiff claims PBSP Correctional Officer Cox ("Officer Cox") acted with deliberate indifference to plaintiff's serious medicals need on May 20.  The evidence submitted by the parties in support of and opposition to the motion for summary judgment shows the following:

According to plaintiff, on May 20, during "second watch" he informed Officer Cox that he had recently had a liver biopsy and was having trouble breathing and was in severe pain.  Plaintiff states Officer Cox brushed him aside and did nothing to obtain medical assistance for him, forcing plaintiff to spend the remainder of the day without medical care. (FAC ¶¶ 43-44.)

According to Officer Cox, on May 20, Officer Cox was on "first watch" and worked a floor shift from 6:00 a.m. to 2:00 p.m. in plaintiff's housing unit, the Segregated Housing Unit in Facility C.  (Decl. Officer Cox in Supp. PBSP Defs. Mot. Summ. J. ("Cox Decl.") ¶ 3.)  At no time during the time period alleged by plaintiff did plaintiff provide Officer Cox with a medical request form, as required by prison regulations, request that Officer Cox summon emergent medical care, or appear to be in need of emergent medical care.  (Id.) Additionally, at no time during the time period alleged by plaintiff did Officer Cox refuse to permit plaintiff to receive medical care, ignore any request for medical care, or intentionally delay plaintiff's access to medical care.  (Id.)  Further, plaintiff's receipt of emergent medical care was not entirely dependent upon Officer Cox.  (Id. ¶ 4.)  Inmates housed in Facility C

United States District Court

For the Northern District of California

1  have access to the control-booth officer via an audio system, and may communicate from the

2  inside of their cells with the officer in the control booth at any time  (Id.)  Additionally, if

3  plaintiff required medical treatment, he could have contacted the medical staff, because they

4  were in plaintiff's housing unit distributing medication during Officer Cox's watch.  (Id.)

5              b.  Analysis

6          In deciding Officer Cox's motion for summary judgment, the Court must view the

7  facts in the light most favorable to plaintiff, the non-moving party.  Even when the facts are

8  viewed in plaintiff's favor, however, they are insufficient to support a finding that Officer

9  Cox's actions amounted to deliberate indifference to plaintiff's serious medical needs.

10  Specifically, even if Officer Cox did not respond to plaintiff's request for immediate medical

11  attention, Officer Cox has presented undisputed evidence showing that during Officer Cox's

12  shift, plaintiff had access to medical care through the control-booth officer and, most

13  importantly, directly through medical staff who were in plaintiff's unit.

14         Consequently, even accepting plaintiff's account of his verbal exchange with Officer

15  Cox, plaintiff has failed to show he was without access to medical care absent Officer Cox's

16  assistance, nor has plaintiff submitted any evidence to suggest Officer Cox had reason to

17  believe plaintiff's receipt of medical care was dependent on Officer Cox.  Consequently, the

18  undisputed evidence shows Officer Cox did not consciously disregard a substantial risk of

19  serious harm to plaintiff, in violation of the Eighth Amendment.

20         Accordingly, summary judgment will be granted in favor of Officer Cox on plaintiff's

21  Eighth Amendment claim.

22              4.  Nurse Carr

23              a.  Facts

24         Plaintiff claims he received constitutionally inadequate care at PBSP from Nurse Carr

25  on May 21.  The evidence submitted by the parties in support of and opposition to the motion

26  for summary judgment shows the following:

27         On May 21, plaintiff continued to suffer problems breathing, and the pain in his

28  stomach and chest escalated.  He was taken on a stretcher to the medical clinic.  (FAC ¶¶ 45-

United States District Court

For the Northern District of California

57.)  Plaintiff was seen there by Nurse Carr, who placed EKG cables on plaintiff to monitor his heart and took plaintiff's vital signs.  (Id. ¶ 60.)  Nurse Carr found the EKG results and plaintiff's vital signs to be normal.  (Decl. J. Carr Supp. PBSP Defs. Mot. Summ. J. ("Carr Decl.") ¶ 4.)  Nurse Carr noted that plaintiff was conversant during the examination and in no apparent physical distress, and that he was able to walk without any guarding of his chest area.  (Id.)  Plaintiff told Nurse Carr he had recently had a liver biopsy and had been having medical problems ever since, including severe pain in his chest and stomach, and trouble breathing. (FAC ¶ 61.)

Nurse Carr consulted with defendant C. Williams, M.D. ("Dr. Williams"), gave plaintiff a gastrointestinal "cocktail," and monitored plaintiff's symptoms.  (FAC ¶ 60; Maiorino Decl. Ex. A AGO 202.)  After monitoring plaintiff, Nurse Carr again consulted with Dr. Williams about plaintiff's symptoms. (FAC ¶ 62; Carr Decl. ¶ 4.)  Dr. Williams prescribed Nexium, a gastrointestinal medication. (FAC ¶ 63; Carr Decl. ¶ 4.)

Based on Nurse Carr's medical evaluation of plaintiff and Nurse Carr's conversation with Dr. Williams, Nurse Carr did not believe plaintiff was suffering from physical complications from the liver biopsy, and there was no indication that plaintiff was suffering from infection or internal bleeding.  (Carr Decl. ¶ 4.)  Nurse Carr did, however, identify in Nurse Carr's medical examination notes that "the mechanism of injury" was "possibly related to liver biopsy." (Carr Decl. ¶ 4 & Ex. A AGO 201.)  Nurse Carr instructed plaintiff to return to the medical clinic if his chest pain persisted or if he had profuse sweating, and scheduled plaintiff for a follow-up medical appointment on May 26.  (Carr Decl. ¶ 4.)  After the May 21 examination, Nurse Carr had no further contact with Plaintiff.  (Id.)

b.  Analysis

Plaintiff maintains the evidence shows Nurse Carr acted with deliberate indifference to plaintiff's serious medical needs by failing to properly treat plaintiff after diagnosing him as suffering from complications from the liver biopsy.  The Court finds no evidence of deliberate indifference.  To the contrary, the undisputed evidence shows Nurse Carr thoroughly examined plaintiff, twice consulted with Dr. Williams about plaintiff's condition,

United States District Court

For the Northern District of California

advised plaintiff to return to the clinic if his symptoms persisted, and scheduled a follow-up appointment for him.  Further, the evidence does not show Nurse Carr diagnosed plaintiff as having complications relating to his liver biopsy.  Nurse Carr's medical notes show Nurse Carr considered such complication as one possible explanation for plaintiff's medical complaints.  Rather than evidencing deliberate indifference to plaintiff's serious medical needs, such notation reflects Nurse Carr's attention to detail and attempt to provide plaintiff with appropriate medical treatment.

Based on the above, the Court concludes there is no evidence from which a reasonable trier of fact could conclude Nurse Carr acted with deliberate indifference to plaintiff's serious medical needs.  Accordingly, summary judgment will be granted in favor of Nurse Carr on plaintiff's Eighth Amendment claim.

5.  Nurses Bree and Timme

a.  Facts

Plaintiff claims he received constitutionally inadequate medical care at PBSP from Lori Bree, R.N. ("Nurse Bree') and David Timme, R.N. ("Nurse Timme") on May 22 and 23. The evidence submitted by the parties in support of and opposition to the motion for summary judgment shows the following:

On May 22, plaintiff requested medical treatment and complained that he had severe chest and back pain and breathing difficulties, and that he could not sleep because of the pain and shortness of breath.  (FAC ¶ 66; Maiorino Decl. Ex. A AGO 016-17.)  Nurse Bree responded to the request by coming to plaintiff's cell.  (Id.)  She spoke to plaintiff and found him to be alert, oriented, and observed that he moved with a steady gait. (Decl. L. Bree in Supp. PBSP Defs. Mot. Summ. J. ("Bree Decl.") ¶ 4 & Ex. A AGO 017.)  Plaintiff denied vomiting, nausea, cough, stomach cramps, leg cramps, or any abdominal discomfort.  (Id.) Nurse Bree took plaintiff's vital signs and found them to be normal.  (Id.)  Nurse Bree was aware that plaintiff had undergone a liver biopsy on May 17 and had been seen by PBSP medical staff the day before.  (Id.).  She examined him and saw no medical indication that he was suffering from infection or internal bleeding, and examined the biopsy area and

United States District Court

For the Northern District of California

saw no inflammation or any indications of infection.  (Id.)  Nurse Bree contacted the liver-biopsy nurse and told the nurse about plaintiff's complaints, Nurse Bree's observations, and plaintiff's vital signs.  Nurse Bree scheduled plaintiff to see a doctor the next day.  (Id.)

Later that same day, plaintiff again complained about his medical needs and was escorted to the medical clinic, where he was evaluated by Nurse Timme.  (FAC ¶ 74; Decl. D. Timme in Supp. PBSP Defs. Mot. Summ. J. ("Timme Decl.") ¶ 4.)  Plaintiff wanted to go to the Correctional Treatment Clinic for an EKG.  Nurse Timme took plaintiff's vital signs and determined his breathing, heart rate and temperature were normal.  (Timme Decl. ¶ 4.)  Plaintiff did not appear to be in any physical distress, and was able to walk and talk without guarding of his chest area.  (Id.)  Nurse Timme determined there was no medical indication that plaintiff was suffering from cardiac-related problems, infection, or internal bleeding.  (Id.)  Nurse Timme was aware plaintiff had been medically evaluated on May 21 for the same complaints and had been provided medication, and that he was scheduled to see a doctor the next day.  (Id.)  Immediately after Nurse Timme told plaintiff he did not need an EKG and that he would be seen by a physician the next day, an emergency alarm was activated in another area of the prison and Nurse Timme was required to end the examination and respond to the emergency.  (Id.)

The next morning, May 23, plaintiff again complained about his medical condition and continuing pain.  He was seen by Nurse Bree.  (FAC ¶ 92.)  She took plaintiff's vital signs, which were within normal limits, and told him he would be seen by a doctor later that day.  (Bree Decl. ¶ 5.)

                    b.  Analysis

Plaintiff contends Nurses Bree and Timme acted with deliberate indifference to his serious medical needs by failing to properly respond to his requests for care.  The undisputed evidence, however, shows Nurse Bree and Nurse Timme did not purposefully fail to respond to or ignore plaintiff's medical complaints.  Although neither Nurse Bree nor Nurse Timme discovered that plaintiff had suffered a complication during the liver biopsy procedure, such evidence does not support an inference that they knew plaintiff faced a substantial risk of

14

serious harm and disregarded that risk by failing to take reasonable steps to abate it.  Rather, the evidence shows Nurses Bree and Timme reasonably responded to plaintiff's medical complaints.

Based on the above, the Court concludes there is no evidence from which a reasonable trier of fact could conclude either Nurse Bree or Nurse Timme acted with deliberate indifference to plaintiff's serious medical needs.  Accordingly, summary judgment will be granted in favor of Nurses Bree and Timme on plaintiff's Eighth Amendment claims.

### 6.   Drs. Rowe and Williams

#### a.   Facts

Plaintiff claims he received constitutionally inadequate medical care at PBSP from Linda Rowe, M.D. ("Dr. Rowe") and Dr. Williams on May 23.  The evidence submitted by the parties in support of and opposition to the motion for summary judgment shows the following:

Plaintiff was seen in the PBSP medical clinic by Dr. Rowe on the afternoon of May 23.  (FAC ¶ 105.)  Prior to this interaction with plaintiff, Dr. Rowe had no knowledge that plaintiff had requested medical treatment after his liver biopsy and had no opportunity to treat him.  (Decl. L. Rowe, M.D., in Supp. PBSP Defs. Mot. Summ. J. ("Rowe Decl.") ¶ 6.)  During the examination by Dr. Rowe, plaintiff complained of pains in his right upper-body quadrant, including the shoulder, chest and lung areas, and stated the pain "comes and goes." (Rowe Decl. ¶ 7.)  He further complained of a decreased appetite and stated he felt some nausea but had not vomited.  (Id.)  He had no fever, but complained of sweating the night before the examination.  (Id.)  He complained that the gastrointestinal medicine he had been given did not relieve the pain.  (Id.)

Dr. Rowe observed that plaintiff had some generalized tenderness in his upper and lower abdomen; she thought the abdominal pain might be related to the May 17 liver biopsy. (Id.)  Believing that plaintiff required a higher level of medical care than the medical clinic could provide him, Dr. Rowe determined plaintiff needed to be transferred to PBSP's Urgent Treatment Area ("UTA") or, possibly, transported to an outside hospital.  (Id.)  Dr. Rowe

United States District Court

For the Northern District of California

1   discussed plaintiff's medical condition with Dr. Williams in the UTA and, immediately

2   thereafter, sent plaintiff to the UTA for further examination.  (Id.; FAC ¶ 106.)

3          Once plaintiff arrived at the UTA, Dr. Williams concluded plaintiff required emergent

4   care and transferred plaintiff to SCH for treatment. (Decl. C. Williams, M.D., in Supp. PBSP

5   Defs. Mot. Summ. J. ("Williams Decl.") ¶ 8.)

6                          b.  Analysis

7          Plaintiff claims Drs. Rowe and Williams acted with deliberate indifference to his

8   serious medical needs by failing to provide him with adequate medical care.  Plaintiff has

9   presented no evidence, however, to support his assertions.

10         Plaintiff claims he should have been seen by Dr. Rowe before May 23; it is

11  undisputed, however, that Dr. Rowe was not aware of plaintiff's need for medical attention

12  prior to her examination of him on that date.  Additionally, there is no evidence to support

13  plaintiff's assertion that on May 23 Dr. Rowe should have seen plaintiff in the morning but

14  delayed seeing him until the afternoon.  Further, even if there was a delay, there is no

15  evidence to support an inference that the cause of such delay was Dr. Rowe's deliberate

16  indifference to plaintiff's serious medical needs rather than, for example, administrative

17  reasons.

18         Similarly, plaintiff's assertion of constitutionally inadequate medical care by Dr.

19  Williams is wholly unsupported by the record.  The undisputed evidence shows that as soon

20  as Dr. Williams saw plaintiff in the UTA, he concluded plaintiff required emergent care and

21  transferred plaintiff to SCH for treatment.

22         Accordingly, based on the above, summary judgment will be granted in favor of Drs.

23  Rowe and Williams on plaintiff's Eighth Amendment claims.

24                 7.  SCH Defendants

25                          a.  Facts

26         Plaintiff claims that from May 23 through May 25 he received constitutionally

27  inadequate medical care from SCH medical practitioners Andrean Gurov, M.D. ("Dr.

28  Gurov"), Donald Micheletti, M.D. ("Dr. Micheletti"), Sylvia Nash, M.D. ("Dr. Nash"),

United States District Court

For the Northern District of California

1  Sandra Saunders, M.D. ("Dr. Saunders"), Susan Schommer, M.D. ("Dr. Schommer"), and

2  Physician's Assistant Gina Gastelum ("P.A. Gastelum").  The evidence submitted by the

3  parties in support of and opposition to the motion for summary judgment shows the

4  following:

5      Plaintiff arrived at the SCH Emergency Department ("ED") at approximately 4:00

6  p.m. on May 23. (Decl. Aaron T. Schultz, Esq., in Supp. Gastelum/Nash/Saunders Mot.

7  Summ. J. ("Schultz Decl.") Ex. B (SCH Medical Records) at 23.)  Upon arrival in the ED,

8  plaintiff was triaged as a Level 3 and kept on a gurney until an examination room was

9  available.  (Id. at 29, 31, 32.)  At approximately 4:45 p.m., plaintiff was examined by P.A.

10  Gastelum, who first encountered plaintiff while plaintiff was in the examination room.

11  (Decl. G. Gastelum in Supp. Gastelum/Nash/Saunders Mot. Summ. J. ("Gastelum Decl.") ¶

12  4.)  Gastelum performed a physical examination of plaintiff and took his medical history.

13  (Id. & Ex. B at 26-27.)  After she examined plaintiff, P.A. Gastelum determined plaintiff

14  needed to be seen by her supervising physician, Dr. Saunders.  (Id.)

15      P.A. Gastelum brought plaintiff to the attention of Dr. Saunders, who performed a

16  physical examination of plaintiff and determined plaintiff needed a CT scan in order for his

17  abdominal complaints to be evaluated.  (Gastelum Decl. ¶ 4; Decl. S. Saunders, M.D., in

18  Supp. Gastelum/Nash/Saunders Mot. Summ. J. ("Saunders Decl.") ¶ 4); Ex. B at 26-27, 31.)

19  While plaintiff was having his CT scan, Dr. Saunders's shift ended.  Dr. Saunders had no

20  further contact with plaintiff.  (Saunders Decl. ¶ 4.)

21      Upon plaintiff's return to the ED following the CT scan, it was noted that plaintiff's

22  pain was worsening and that he had vomited approximately 250 ml of blood.  Plaintiff was

23  then given pain medication.  (Gastelum Decl. ¶ 5 & Ex. B at 26-27, 31.)

24      Following the CT scan, another physician, Dr. Nash, took over as the supervising ED

25  physician. (Gastelum Decl. ¶ 6 & Exhibit B at 24 - 25.)  Dr. Nash performed a physical

26  examination of plaintiff and reviewed his medical history and tests.  (Decl. S. Nash, M.D., in

27  Supp. Gastelum/Nash/Saunders Mot. Summ. J. ("Nash Decl.") ¶ 4.)  The CT scan showed

28  plaintiff had high density material in his gallbladder consistent with hemorrhage in the biliary

17

United States District Court

For the Northern District of California

1   system.  (Id.)  From her examination and results of the CT scan, Dr. Nash determined

2   plaintiff needed to be admitted to the hospital because of complications following a liver

3   biopsy.  (Id.)  Dr. Nash contacted Dr. Schommer, the surgeon on call, to consult on plaintiff's

4   condition.  (Id.)  Dr. Schommer agreed to see plaintiff for surgical consultation and to

5   perform an EGD (esophagogastroduodenscopy), but requested plaintiff be admitted to the

6   Internal Medicine department in light of the medical care required for treating a patient with

7   hepatitis.  (Decl. Jeff Schwartz, M.D., in Supp. Schommer Mot. Summ. J. ("Schwartz Decl.")

8   ¶ 6(c).)

9        Following Dr. Schommer's request, Dr. Nash contacted Dr. Andrean Gurov, who

10   agreed to be the admitting physician for plaintiff.  (Decl. Matthew J. Miller, M.D., in Supp.

11   Gurov/Micheletti Mot. Summ. J. ("Miller Decl." ¶ 10.)  At approximately 9:30 p.m. on May

12   23, Dr. Gurov completed a medical history and physical examination of plaintiff.  (Id. ¶ 11.)

13   Dr. Gurov reviewed laboratory data obtained in the ED and plaintiff's CT scan, and assessed

14   plaintiff as having an upper GI bleed.  (Id. ¶¶ 12-13.)  Dr. Gurov ordered IV fluids, a proton

15   pump inhibitor to reduce gastric acid, and Zosyn, an antibiotic, to cover cholecystitis

16   (inflammation of the gall bladder).  In Dr. Gurov's assessment, plaintiff was not septic and

17   was stable, being minimally symptomatic.  (Id.)

18        Dr. Gurov called Dr. Schommer, who was scheduled to perform an EGD the next day.

19   Dr. Gurov planned to admit plaintiff to telemetry for monitoring, and to have plaintiff's

20   complete blood count ("CBC") monitored every four to six hours.  (Id. ¶ 14.)  Dr. Gurov

21   noted that a blood transfusion would be considered if necessary, and plaintiff was typed and

22   screened for compatible blood products.  (Id.)  Dr. Gurov also noted that plaintiff's

23   electrolytes would be followed.  (Id.)  Plaintiff was admitted to the Intensive Care Unit

24   ("ICU") at approximately midnight and was continued on medications for nausea, vomiting

25   and pain.  His vital signs all remained stable.  (Id. ¶ 16.)

26        The next day, May 24, at 1:00 p.m., Dr. Schommer consulted with plaintiff.  After

27   examining plaintiff and reviewing his medical records, lab results and CT scan, it was Dr.

28   Schommer's impression that plaintiff had an intrahepatic bleed secondary to the liver biopsy.

United States District Court

For the Northern District of California

(Schwartz Decl. ¶ 6(e).)  Her plan was to perform an EGD to find the source of the bleeding. Dr. Schommer explained the risks and benefits of the procedure and that intravenous sedation was going to be used.  Plaintiff consented to the procedure and, that same date, Dr. Schommer performed a video EGD.  The procedure was completed without complication and plaintiff was transferred to the intensive care unit in stable condition.  (Id. ¶ 6(f)-(g).)

After completing the procedure, Dr. Schommer discussed the results of the EGD with Dr. Gurov.  Dr. Schommer's impression was that the bleeding appeared to be coming from the biliary ducts and/or gallbladder and that plaintiff potentially could develop cholangitis (an infection of the bile duct) due to clotting.  Dr. Schommer recommended plaintiff be maintained on IV anticoagulants, antibiotics and protonics, that he remain hospitalized, and that his vital signs and lab results be monitored.  Dr. Schommer ordered follow-up blood work and indicated she would follow plaintiff with Dr. Gurov.  (Id. ¶ 6(h); Miller Decl. ¶ 20.)

Dr. Gurov saw plaintiff that same date at approximately 4:00 p.m.  Dr. Gurov's progress note indicates plaintiff felt well and his vital signs were stable.  Dr. Gurov had read Dr. Schommer's report recommending plaintiff be kept for observation for possible bile duct obstruction or cholangitis, and felt plaintiff could be transferred to the medical surgery unit. (Miller Decl. ¶ 21.)

Dr. Schommer saw plaintiff the following day, May 25, at 8:45 a.m., after receiving a call from the nurses, who indicated plaintiff complained of dizziness, nausea and increased right upper quadrant pain.  (Schwartz Decl. ¶ 6(i).)  After physically examining plaintiff and reviewing his CBC, it was Dr. Schommer's impression that plaintiff had new onset leukocytosis (an elevated white blood cell count) and urinary retention.  She recommended transferring plaintiff to a higher level of care, as she believed he would need consultation with a gastroenterologist and quite possibly a biliary surgeon.  (Id.)

That same date, Dr. Micheletti arranged for plaintiff's transfer to the care of Dr. Hobart Harris at UCSF.  Dr. Micheletti completed a discharge summary at approximately 1:40 p.m., which included an assessment of the treatment plaintiff had received at SCH and plaintiff's most recent lab results.  Based on such assessment, Dr. Micheletti determined a

19

United States District Court

For the Northern District of California

1   blood transfusion was not necessary, that plaintiff was in no acute distress, and that he was

2   stable for transfer.  (Miller Decl. ¶ 24.)  While waiting to be transferred, plaintiff continued

3   to receive IV morphine for pain, pursuant to Dr. Micheletti's orders.  (Id. ¶ 25.)

4        At approximately 4:20 p.m., UCSF notified the discharge planner that UCSF had a

5   bed for plaintiff and wanted him to arrive after 7:00 p.m.  At 7:45 p.m. plaintiff was

6   discharged from SCH to the transport team for transfer to UCSF by air ambulance.  No acute

7   changes were reported.  (Id. ¶ 26.)  Plaintiff was admitted to UCSF that night.  The following

8   day, May 26, plaintiff required a blood transfusion and another abdominal CT scan was

9   performed.  Based on the information from that CT scan, a hepatic arteriogram was

10  performed.  A lacerated right hepatic artery branch vessel and an arterioportal fistula (a

11  connective growth between the hepatic artery and the portal vein) were identified.  Surgery

12  was successfully performed, after which plaintiff's abdominal pain resolved.  The UCSF

13  discharge summary states plaintiff was in very good condition two days after the surgical

14  procedure.  On May 28, he was transferred back to PBSP.  (Id. ¶ 28.)

15                    b. Analysis

16       Plaintiff claims all of the above SCH medical practitioners failed to provide him with

17  constitutionally adequate medical care.  Plaintiff, however, has failed to present evidence

18  sufficient to raise a triable issue on an essential element of plaintiff's claim, specifically, that

19  any of said defendants acted with deliberate indifference to plaintiff's serious medical needs.

20                 i. Dr. Nash, Dr. Saunders, and P.A. Gastelum

21       Plaintiff claims Drs. Nash and Saunders and P.A. Gastelum failed to promptly provide

22  him with pain medication and other care upon his arrival at the ED at SCH.

23       In moving for summary judgment, said defendants first argue they are not subject to

24  suit under 42 U.S.C. § 1983 because they are not state actors.  An essential element of an

25  action brought under § 1983 is that the defendant accused of violating the plaintiff's

26  constitutional rights acted under color of state law.  See Gomez v. Toledo, 446 U.S. 635, 640

27  (1980).  Action taken by private individuals or organizations may be under color of state law

28  "if, though only if, there is such a close nexus between the State and the challenged action

United States District Court

For the Northern District of California

that seemingly private behavior may be fairly treated as that of the State itself."  Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96 (2001) (internal quotation and citation omitted).

In support of their motion for summary judgment, defendants present evidence that they were not employed by the state of California, specifically, evidence showing Drs. Nash and Saunders both were independent contractors working for SCH, a private hospital, and had not contracted with the state, and evidence showing P.A. Gastelum was employed by SCH.  (Decl. Nash ¶ 3; Decl. Saunders ¶ 3; Decl. Gastelum ¶ 3.)  Further, said defendants argue, they were not otherwise involved in state activity under any of the traditional tests applied by the federal courts for deciding whether a private person or entity qualifies as a state actor.  See Lugar v. Edmonson Oil Co., Inc., 457 U.S. 922, 939 (1982) (identifying public function, state compulsion, nexus and joint-action tests).  Plaintiff offers no evidence or legal argument in opposition.  Based on defendants' undisputed showing, the Court finds Drs. Nash and Saunders and P.A. Gastelum are not state actors for purposes of § 1983.

The Court further finds that even assuming said defendants may be deemed state actors, plaintiff has presented no evidence that raises a triable issue as to his claim that said defendants acted with deliberate indifference to his serious medical needs while he was in the ED at SCH.  Specifically, the evidence shows said defendants undertook to care for and treat plaintiff by examining him, providing him with pain medication, and obtaining consultations and tests that led to his eventual diagnosis and transfer to UCSF.  There is no evidence to suggest any of said defendants at any time knowingly disregarded a substantial risk of serious harm to plaintiff.  Indeed, the only evidence in that regard is the declaration of Elliot S. Nipomnick, M.D. ("Dr. Nipomnick"), a physician specializing in emergency medical care; in Dr. Nipomnick's expert opinion, all of the care provided by the above three individuals was appropriate and within the standard of care. (See Declaration of Elliot S. Nipomnick, M.D. ¶ 11.)

Accordingly, summary judgment will be granted in favor of Drs. Nash and Saunders and P.A. Gastelum on plaintiff's Eighth Amendment claims.

United States District Court

For the Northern District of California

ii.  Dr. Schommer

Plaintiff claims Dr. Schommer acted with deliberate indifference to his serious medical needs by failing to properly diagnose the source of his pain or send him more promptly for a higher level of medical care.  The record does not support plaintiff's assertions.  Rather, the record shows Dr. Schommer reasonably responded to plaintiff's medical needs, as evidenced by the following undisputed facts:  Upon meeting with plaintiff for the first time on the morning of May 24, Dr. Schommer examined plaintiff and reviewed a CT scan, which illustrated blood in the gall bladder and hemobilia; that same date Dr. Schommer performed a video EGD to find the source of the bleeding; immediately following the EGD, Dr. Schommer diagnosed bleeding from the biliary duct and/or liver, and determined that plaintiff should remain in the hospital and be monitored to further determine the source of the bleeding; on May 25, after plaintiff complained of increased pain and had an elevated white blood count, Dr. Schommer immediately recommended plaintiff be transferred to a facility with a higher level of care in order that he could be evaluated by a gastroenterologist and a biliary surgeon.

Other than plaintiff's declaration asserting Dr. Schommer's care was inadequate, plaintiff has presented no evidence to counter the record of care Dr. Schommer provided or the appropriateness of her medical decisions.  Rather, the only evidence as to the propriety of the care given by Dr. Schommer is that provided by Jeffrey Schwartz, M.D., an expert offered in support of Dr. Schommer's motion for summary judgment.  In Dr. Schwartz's opinion, the care and treatment provided by Dr. Schommer was, in all respects, in conformity with the requisite standard of care.  (See Schwartz Decl. ¶ 13.)  Plaintiff's unsupported allegations that Dr. Schommer failed to properly examine and diagnose him are insufficient to raise a triable issue on plaintiff's claim that Dr. Schommer knowingly disregarded a substantial risk of serious harm to plaintiff.  Accordingly, summary judgment will be granted in favor of Dr. Schommer on plaintiff's Eighth Amendment claim.

iii.  Drs. Gurov and Micheletti

Plaintiff claims Drs. Gurov and Micheletti acted with deliberate indifference to his

United States District Court

For the Northern District of California

1  serious medical needs because they failed to properly diagnose him, treat his pain, and

2  provide him with a blood transfusion prior to his transfer to UCSF.

3      To counter plaintiff's claims, defendants have presented undisputed evidence showing

4  Dr. Gurov reviewed plaintiff's CT scan and assessed plaintiff as having an upper GI bleed,

5  ordered that plaintiff be given IV fluids and medications, had plaintiff's blood typed and

6  screened in case he needed a blood transfusion, retained plaintiff in the hospital after the

7  EGD to monitor plaintiff for the source of the GI bleed, and consulted with Dr. Schommer

8  about plaintiff's condition.  Additionally, defendants undisputed evidence shows Dr.

9  Micheletti assessed plaintiff for transfer on the same date he was asked to do so, prescribed

10  pain medication for plaintiff, and determined, based on plaintiff's lab results, that plaintiff

11  did not require a blood transfusion prior to being transferred.

12      Defendants have submitted expert evidence that all of the care and treatment provided

13  by Drs. Gurov and Micheletti was well within the requisite standard of care.  (See Miller

14  Decl. ¶ 34.)  In opposition to defendants' evidence, plaintiff has presented only his

15  declaration asserting the care he received was inadequate.  Plaintiff's conclusory assertions

16  are insufficient to raise a triable issue as to plaintiff's claim that defendants knowingly

17  disregarded a substantial risk of serious harm to him.  Accordingly, summary judgment will

18  be granted in favor of  Drs. Gurov and Micheletti on plaintiff's Eighth Amendment claims.

19          8.   Conclusion

20      In sum, for the reasons stated above, the Court finds plaintiff has failed to present

21  evidence sufficient to raise a triable issue, with respect to any of the above-named

22  defendants, on his claim that such defendants acted with deliberate indifference to his serious

23  medical needs in violation of the Eighth Amendment.  Accordingly, summary judgment will

24  be granted in favor of all defendants against whom plaintiff has asserted such claims.

25  III.   Excessive Force: defendants Mills, Quam, Timme and Nelson

26      Plaintiff claims PBSP Correctional Officers R. Mills ("Officer Mills") and D. Quam

27  ("Officer Quam") used unwarranted force against him in violation of the Eighth Amendment,

28  when escorting him from the prison medical clinic on May 22.  He further claims Nurse

Timme and Medical Technical Assistant ("MTA") Nelson unlawfully failed to intervene to stop the use of force.

Whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, courts evaluate such factors as the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  Id. at 7.  A prisoner need not demonstrate, however, that he suffered serious injury in order to establish an Eighth Amendment violation based on use of excessive force.  See id. (holding "absence of serious injury is [ ] relevant to the Eighth Amendment inquiry, but does not end it"); see also Wilkins v. Gaddy, 130 S.Ct. 1175, 1178, 1180 (2010) (noting Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim"; reversing dismissal where district court's determination based solely on finding of "de minimis" injury) (citing Hudson).

Although liability under § 1983 does not attach to "a mere bystander" who had "no role in the unlawful conduct," Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir. 2004), "[a] prison official can violate a prisoner's Eighth Amendment rights by failing to intervene," provided such official had an opportunity to intervene.  See Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995) (affirming denial of summary judgment in favor of correctional officers where evidence showed officers, at time of alleged improper shooting, were in same control bubble as officer who fired shotgun but took no action to prevent such officer from firing, and officers offered no evidence they lacked opportunity to intervene); see also Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (holding on Fourth Amendment claim of excessive force, "officers can be held liable for failing to intercede only

if they had an opportunity to intercede").

    A.    Background

        1.    Plaintiff's Facts

In support of his claim, plaintiff presents the following evidence:

On the afternoon of May 22, plaintiff was escorted to the medical clinic by Correctional Officers Quam and Mills.  (FAC ¶ 73.)  While plaintiff was explaining his medical problem to Nurse Timme, defendant MTA Nelson walked into the office and said an alarm had gone off and they needed to attend to a medical emergency.  (Id. ¶ 75.)  Nurse Timme and MTA Nelson told plaintiff he would be alright, and that they needed to leave.  (Id.)  Plaintiff requested to see a doctor, but Nurse Timme and MTA Nelson informed plaintiff that plaintiff had to leave as well.  (Id. ¶ 76.)

Officer Mills asked plaintiff to get up, and grabbed plaintiff's arm tightly, explaining they needed to attend to a medical emergency.  Plaintiff questioned why he had to leave, explaining he too was experiencing a medical emergency.  (Id. ¶¶ 78-82.)  Officer Mills then grabbed plaintiff's arm tighter and told Officer Quam to grab plaintiff.  (Id. ¶ 83.)  At that point, both Officers Mills and Quam "physically and harshly yanked [plaintiff] from the chair and threw [him] to the ground."  (Id. ¶ 84.)  While on the ground, plaintiff "felt punches" to his back, and he was dragged almost all the way to the door.  (Id.)  When plaintiff finally was able to gain some strength, he walked voluntarily to his cell.  (Id. ¶ 88.)

Both Nurse Timme and MTA Nelson witnessed the assault, but neither of them attempted to intervene to stop Officers Mills and Quam from beating and dragging him.  (Id. ¶ 87.)

        2.    Defendants' Facts

            a.    Officers Mills and Quam

According to Officer Mills, the events occurred as follows:

Officer Mills had escorted plaintiff to the medical clinic for a medical evaluation on May 22.  (Decl. R. Mills in Supp. PBSP Defs. Mot. Summ. J. ("Mills Decl." ¶ 6.)  At the clinic, Nurse Timme completed the examination and released plaintiff to return to his cell.

25

United States District Court

For the Northern District of California

(Id.)  Plaintiff began to argue with Nurse Timme.  (Id.)  During the argument, an alarm was activated, signaling a medical emergency in another area of the prison.  (Id.)

Despite being told that Nurse Timme was required to respond to the emergency, plaintiff continued to argue with Nurse Timme.  (Id.)  Officer Mills ordered plaintiff to stand up so he could be escorted to his cell.  (Id.)  Plaintiff refused to comply with the order.  (Id.)  Officer Mills commenced a hands-on escort by placing one hand on plaintiff and repeating the order to stand up.  (Id.)  Plaintiff stood and Officer Mills began his hands-on escort to plaintiff's cell.  (Id.)  Before leaving the clinic, however, plaintiff made his body limp, sunk to the floor, and rested on his knees.  (Id.)  Officer Mills ordered plaintiff to stand, but plaintiff refused to comply with the order.  (Id.)  Officer Mills, with his hand on plaintiff's arm, repeated the order and made a forward motion toward the door.  (Id.)  Plaintiff slid a very short distance toward the door while on his knees.  (Id.)  Plaintiff refused to comply with Officer Mills' order to stand and walk, at which time Officer Quam placed his hand on plaintiff's other arm and plaintiff was raised to his feet.  (Id.)  Once plaintiff was on his feet, he walked to his cell without further incident.  (Id.)

b.    Nurse Timme

Nurse Timme provides the following account:

On May 22, plaintiff came to the medical clinic requesting an EKG.  (Timme Decl. ¶ 4.)  Immediately after Nurse Timme told plaintiff he did not need an EKG, a personal alarm was activated in another area of the prison.  Once the alarm is activated, Nurse Timme is required to respond to the emergency and must be prepared to administer medical attention to the person in need of emergent medical attention.  (Id. ¶ 5.)

Nurse Timme told plaintiff that he was obligated to respond to the emergency and that the officers would escort plaintiff to his cell.  Plaintiff refused to leave.  (Id) Nurse Timme prepared to respond to the emergency alarm; as he was leaving the clinic, Nurse Timme saw plaintiff go to his knees and refuse to leave the clinic.  (Id.)  Officer Mills held plaintiff by one arm and Officer Quam held plaintiff by the other arm.  (Id.)  It appeared to Nurse Timme that they were attempting to protect plaintiff from falling on the floor and possibly injuring

26

himself.  (Id.)  At no time on May 22 did Nurse Timme observe either Officer Mills or Officer Quam mistreat plaintiff.  (Id. ¶ 7.)[3]

B.    Analysis

Officers Mills and Quam contend plaintiff has failed to present evidence showing they acted with sadistic and malicious intent in their use of minimal force to compel plaintiff to stand and leave the medical clinic when he refused to do so after the sounding of an alarm announcing a medical emergency in another area of the prison.  Rather, they maintain, their use of force was reasonable under the circumstances.

Plaintiff has presented evidence, however, that said defendants not only grabbed him by the arm in order to get him to stand, as conceded by defendants, but that they also yanked him from his chair, threw him to the ground, and punched him more than once in the back. Given such evidence, which the Court must at this stage of the proceedings view in the light most favorable to plaintiff, the Court finds plaintiff has raised a triable issue of fact with respect to his claim that Officers Mills and Quam used force maliciously and sadistically to cause harm, rather than to maintain order and security when escorting plaintiff from the medical clinic back to his cell.  Consequently, Officers Mills and Quam are not entitled to summary judgment on plaintiff's excessive force claim.

Nurse Timme argues he did not fail to intervene in the use of excessive force by Officers Mills and Quam because he never had the opportunity to intervene.  Specifically, Nurse Timme attests he did not see Officers Mills and Quam engage in any act that could be interpreted as the use of excessive force and, further, that he was responding to a medical emergency at the time and thus was required to leave immediately.

In contradiction of Nurse Timme's evidence that he did not see Officers Mills and Quam use excessive force, plaintiff, as noted, has presented evidence that Nurse Timme did observe said officers beating him and using force in excess of that required to escort him to his cell.  Plaintiff, however, has not presented evidence that calls into dispute Nurse Timme's

_____

[3] MTA Nelson, who has not been served or made an appearance herein, has not submitted a declaration or other evidence.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    evidence that at the time of such alleged use of excessive force Nurse Timme was responding

2    to a medical emergency and, consequently, was unable to stay.  Indeed, plaintiff himself

3    confirms that he was told by Nurse Timme that Nurse Timme was required to respond to

4    such emergency.   Moreover, there is no evidence suggesting Nurse Timme is a law

5    enforcement officer or that Nurse Timme was engaged in any joint action for law

6    enforcement purposes, or that Nurse Timme was otherwise obligated to take action to

7    intervene in or control the conduct of correctional officers.  See Boyd, 374 F.3d at 780

8    (holding bystander having no role in unlawful conduct has no duty to intervene).

9        Accordingly, with respect to plaintiff's excessive force claim, summary judgment will

10   be granted in favor of Nurse Timme and denied with respect to Officer's Mills and Quam.

11   IV.   Supplemental State Law Claims

12       In addition to the above-discussed federal constitutional claims, plaintiff brings

13   supplemental state law claims for medical malpractice (Seventh and Fourteenth Causes of

14   Action), failure to furnish medical care in violation of California Government Code § 845.6

15   (Eighth and Eleventh Causes of Action), negligence (Ninth and Tenth Causes of Action),

16   battery (Twelfth Cause of Action), failure to intervene in the use of force in violation of

17   California Government Code § 844.6 (Thirteenth Cause of Action).

18       A federal court has supplemental jurisdiction over claims "that are so related to claims

19   in the action within [the district court's] original jurisdiction that they form part of the same

20   case or controversy under Article III."  28 U.S.C. § 1367(a).  A district court, however, may

21   decline to exercise supplemental jurisdiction over a claim if (1) the claim raises novel or

22   complex state law issues; (2) the claim "substantially predominates" over the court's

23   original-jurisdiction claims; (3) the court has dismissed all of the original-jurisdiction claims;

24   or (4) in "exceptional circumstances" if there are "other compelling reasons" to decline. 28

25   U.S.C. § 1367(c).  In particular, "[n]eedless decisions of state law should be avoided both as

26   a matter of comity and to promote justice between the parties, by procuring them a

27   surer-footed reading of applicable law."  United Mine Workers of America v. Gibbs, 383

28   U.S. 715, 726 (1966).

United States District Court

For the Northern District of California

1    Here, summary judgment has been granted on all of plaintiff's Eighth Amendment

2  claims for deliberate indifference to his serious medical needs.  As noted, however, plaintiff

3  also asserts six state law claims for relief concerning inadequate medical care.  As plaintiff's

4  only remaining claims for federal relief are the excessive force claims brought against

5  Officers Mills and Quam, the Court concludes plaintiff's state law medical claims

6  substantially predominate over the claims as to which the Court has original jurisdiction.  In

7  particular, plaintiff's state law medical claims are brought against fifteen defendants and

8  require elements of proof that are distinct from both the federal excessive force claim and

9  plaintiff's related battery claim under state law.  Consequently, the Court will decline to

10  assert supplemental jurisdiction over the state law claims pleaded in plaintiff's Seventh,

11  Eighth, Ninth, Tenth, Eleventh and Fourteenth Causes of Action.  See Patel v. Penman, 103

12  F.3d 868, 877 (9th Cir. 1996) (affirming district court's declination of supplemental

13  jurisdiction under § 1367(c)(2) where state law inverse condemnation claim substantially

14  predominated over remaining claim under § 1983); Martin v. Dahlberg, 156 F.R.D. 207, 218

15  (N.D. Cal. 1994) (declining, pursuant to § 1367(c)(2), supplemental jurisdiction where state

16  law claims brought under consumer protection laws substantially predominated over

17  remaining RICO claims); James v. Sun Glass Hut of California, 799 F. Supp. 1083, 1084 (D.

18  Colo. 1992) (declining supplemental jurisdiction under § 1367(c)(2) where plaintiff's state

19  law contract and fraud claims substantially predominated over federal ADEA claim).

20    Accordingly, the state law claims asserted in the above-referenced six causes of action

21  will be dismissed without prejudice to plaintiff's refiling those claims in state court in

22  accordance with the statutory tolling provision set forth at 28 U.S.C. § 1367(d).  See id.

23  ("The period of limitations for any claim asserted under subsection (a), and for any other

24  claim in the same action that is voluntarily dismissed at the same time as or after the

25  dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for

26  a period of 30 days after it is dismissed unless State law provides for a longer tolling

27  period.").

28  V.    Unserved Defendants

29

United States District Court

For the Northern District of California

1     In its May 22, 2009 order directing service of the FAC, the Court directed the United

2    States Marshal ("Marshal") to serve MTA Nelson and Medhane Yordanos, L.V.N. ("Nurse

3    Yordanos"), two newly-named defendants who had not been served with the original

4    complaint.  On August 28, 2009, the unexecuted summons for MTA Nelson was returned to

5    the court with a notation by the Marshal that the summons had been returned to the Marshal

6    by the PBSP Litigation Coordinator for the reason that more information was needed to

7    locate the named individual.  (Docket No. 52.)  Additionally, on September 25, 2009,  the

8    unexecuted summons for Nurse Yordanos was returned to the court with a notation by the

9    Marshal that the summons had been returned to the Marshal by the PBSP Litigation

10    Coordinator for the reason that such individual, a contract employee at PBSP, had retired and

11    was no longer at PBSP.  (Docket No. 76.)

12     To date, neither such defendant has been served.  It is clear, however, that the claims

13    against them are subject to dismissal.  Specifically, plaintiff alleges MTA Nelson, together

14    with Nurse Timme, failed, on May 22, 2007, to respond adequately to plaintiff's request for

15    medical care and to intervene when Officers Mills and Quam used force against plaintiff.

16    (See supra, sections II(A)(5) & III.)  There is no suggestion, however, either in the FAC and

17    exhibits attached thereto or in the briefs and exhibits filed in connection with the PBSP

18    defendants' instant motion for summary judgment, that the Court's analysis of the claims

19    made with respect to plaintiff's claims against MTA Nelson would differ in any respect from

20    the analysis of such claims as alleged against Nurse Timme.  Given the Court's finding that

21    plaintiff has failed to produce evidence sufficient to raise a triable issue as to plaintiff's

22    claims that Nurse Timme acted with deliberate indifference to plaintiff's serious medical

23    needs and failed to intervene in the use of excessive force, plaintiff cannot prevail on those

24    same claims as against MTA Nelson.  Accordingly, the Court will grant summary judgment

25    in favor of MTA Nelson.  See Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery, 44

26    F.3d 800, 803 (9th Cir. 1995) (affirming grant of summary judgment in favor of

27    nonappearing defendant where plaintiff, in response to summary judgment motion filed by

28    appearing defendant, had "full and fair opportunity to brief and present evidence" on

United States District Court

For the Northern District of California

dispositive issue as to claim against nonappearing defendant).

With respect to Nurse Yordanos, plaintiff asserts that when Nurse Yordanos was called to plaintiff's cell on May 21 in response to plaintiff's complaints of pain, the following occurred: (1) Nurse Yordanos asked plaintiff to describe his pain (FAC ¶ 55); (2) as plaintiff was losing consciousness, he heard another inmate ask Nurse Yordanos to press the alarm button, which, in plaintiff's opinion, would have enabled responding officers "to arrive fast," but Nurse Yordanos did not do so (Id. ¶ 56); (3) plaintiff thereafter woke up, was placed on a stretcher, and transported to the Correctional Treatment Center ("CTC"); while en route to the CTC, Nurse Yordanos took plaintiff's vital signs (Id. ¶¶ 57-60.)  Even when the facts asserted by plaintiff are viewed in the light most favorable to him, plaintiff has failed to present evidence from which a reasonable trier of fact could conclude Nurse Yordanos acted with deliberate indifference to plaintiff's serious medical needs.  In particular, plaintiff has not shown he was sufficiently conscious to know whether the alarm was used.  Moreover, transportation was provided and there is no evidence of any delay in that regard. Consequently, even if Nurse Yordanos did not push the alarm button, there is no evidence to suggest Nurse Yordanos knowingly disregarded a substantial risk of serious harm to plaintiff. Accordingly, as there is no suggestion in the FAC and exhibits attached thereto, or in the briefs and exhibits filed in connection with the PBSP defendants' instant motion for summary judgment, that Nurse Yordanos acted other than in a medically appropriate manner or that plaintiff suffered any injury as a result of Nurse Yordanos' actions, summary judgment will be granted in favor of Nurse Yordanos.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.  Summary judgment is hereby GRANTED in favor of the following defendants on plaintiff's claims of deliberate indifference to plaintiff's serious medical needs: Dr. Sogge, Nurse Waddell, Correctional Officer Cox, Nurse Carr, Nurse Bree, Nurse Timme, Dr. Rowe, Dr. Williams, Physician's Assistant Gina Gastelum, Dr. Saunders, Dr. Nash, Dr. Schommer, Dr. Gurov, Dr. Micheletti and Nurse Yordanos.

United States District Court
For the Northern District of California

1     2.  Plaintiff's supplemental state law claims alleging inadequate medical care are

2     hereby DISMISSED without prejudice to plaintiff's raising those claims in state court.

3     3.  Summary judgment is hereby GRANTED in favor of Nurse Timme and MTA

4     Nelson on plaintiff's claims of excessive force.

5     4.  Summary judgment is hereby DENIED with respect plaintiff's claims of excessive

6     force as alleged against Officers Mills and Quam.

7     5.  The instant matter is hereby REFERRED to Magistrate Judge Nandor Vadas for

8     settlement proceedings on plaintiff's remaining excessive force claims.  The proceedings

9     shall take place within 120 days of the date this order is filed, or as soon thereafter as

10    Magistrate Judge Vadas' calendar will permit.  Magistrate Judge Vadas shall coordinate a

11    place, time and date for one or more settlement conferences with all interested parties and/or

12    their representatives and, within fifteen days of the conclusion of all settlement proceedings,

13    shall file with the Court a report  thereon.

14    <u>The Clerk is directed to serve Magistrate Judge Vadas with a copy of this order and to</u>

15    <u>notify Magistrate Judge Vadas that a copy of the court file can be retrieved from the court's</u>

16    <u>electronic filing database (ECF).</u>

17    This order terminates Docket Nos. 60, 81, 112, 116 and 121.

18    IT IS SO ORDERED.

19    DATED: September 30, 2010

20

21    MAXINE M. CHESNEY
      United States District Judge
22

23

24

25

26

27

28